956 A.2d 884

**Christopher A. Lan BUCK**

v.

**STATE of Maryland.**

**No. 850 Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Sept. 11, 2008.

588

594

John M. McKenna (Brennan, Sullivan & McKenna, LLP, on the brief), Greenbelt, for Appellant.

Jeremy M. McCoy (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: DEBORAH S. EYLER,* BARBERA, RAYMOND
G. THIEME, JR. (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

In the Circuit Court for Charles County, Christopher Alan
Buck was charged with first-degree murder, first-degree as-
sault, and carrying a deadly weapon openly with the intent to
injure. He entered a plea of not criminally responsible.
Before trial, he moved to suppress statements he made to the
police. The court denied the suppression motion.

In a trial to the court, Buck was found guilty on all counts.
The court further ruled that he had failed to prove that he was
not criminally responsible for his actions. The court sen-
tenced him to life in prison for first-degree murder and a
three-year concurrent term for carrying a deadly weapon.
The first-degree assault conviction was merged for sentencing.

On appeal, Buck raises three questions, which we have
reordered and reworded:

I. Did the circuit court err in denying his motion to
suppress the statements he made to the police?

II. Was the evidence legally sufficient to support his first-
degree murder conviction?

III. Did the trial court err in finding him criminally re-
sponsible?

For the following reasons, we shall reverse the judgments of
the circuit court and remand for further proceedings.

## I.

### Motion to Suppress Inculpatory Statements to Police

The following facts were adduced at the suppression hear-
ing, or are uncontested and included for context.[1]

---

* Mary Ellen Barbera, J., now serving on the Court of Appeals, participat-
ed in the hearing and conference of this case while an active member of
this Court; she participated in the adoption of this opinion as a
specially assigned member of this Court.

1. As noted *infra,* all of the witnesses at the suppression hearing were
law enforcement officers called by the State.

This case arises out of the stabbing death of Edward Baroody, age 74. On February 28, 2005, at 6:30 a.m., Bonnie Goldsmith, Baroody's wife, found his body in the driveway of their home at 6769 Amherst Road, in the Bryan's Road community in Charles County. Officer Patrick McDonald, of the Charles County Sheriff's Office, responded to a call from Goldsmith.[2] He found Baroody's body lying near the sidewalk in front of the house. The body was "very cold to the touch, and had mild rigor setting in." There was $1,400 in cash in the victim's pockets. Nothing appeared to have been taken from the body.

Sergeant Carlson[3] responded to the scene and saw the victim lying on his back in the driveway. He and another officer rolled the body over and saw "a puncture hole in the jacket in the center of the back near the top with a blood stain around it that appeared fresh."

Goldsmith told the police she had returned home from work the evening before (February 27), at about 8:00 p.m., and "everything was fine." Bonnie Carpenter, the neighbor across the street, told the police that at about 8:20 or 8:30 p.m. that same evening, her daughter told her she was in her bedroom in the front of the house when she heard someone cry out for help. Carpenter went outside, but did not notice anything amiss. Melissa Roberts, also a neighbor, reported that, at about 8:15 p.m. that evening she was driving on Amherst Road when she saw an older man walking at a "moderate stroll," near a stop sign. She noticed another man quickly walk up behind the older man. The second man had his right hand "[t]ucked down into [his] waistband." He was wearing a "[m]edium gray hoodie" that was pulled so tightly on his face that only his eyes, nose, and mouth could be seen.

On the evening of March 1, 2005, Detectives Tim Minor, James Martin, and Charles Bean were in the neighborhood of

---

**2.** All of the police officers involved in investigating this case were with the Charles County Sheriff's Office.

**3.** The record does not reveal Sergeant Carlson's first name.

the Baroody killing, investigating. Detective Minor noticed a man (Buck) walking about. He fit Melissa Roberts's physical description of the murder suspect and was wearing a gray hooded sweatshirt.

The detectives approached Buck and asked him if he had heard of any recent incidents in the neighborhood. He replied no, but within seconds added, "Oh, you mean the stabbing?" When asked where he had been on the night of February 27, 2005, Buck said it was his routine every night at about 8:00 p.m. to walk from his house in the Bryan's Road neighborhood to the BP station, to buy cigarettes; and that is what he had done on February 27.[4]

Detective Minor observed that Buck became nervous as the officers were speaking with him. Detective Bean asked Buck if he could take some digital photographs of him. Buck said yes, and the detective took the pictures. Also during this encounter, Detective Minor telephoned Detective Joe Piazza, the lead investigator on the Baroody case, and said, "I think we got him." That call was made in Buck's presence and was heard by him.

Buck told the detectives that he was on his way to the BP station to purchase cigarettes. Detective Martin offered to give him a ride, and he accepted. In the meantime, Detectives Bean and Minor drove to the house where Buck, then 21 years old, was living with his parents and two younger sisters. The detectives spoke to his mother, Diane Buck.[5] Mrs. Buck told them she feared that her son might have been involved in the Baroody murder. She explained that Buck had been suffering from "severe depression" for three or four years for which he had been prescribed "a couple" of medications. His behavior was unpredictable. He usually would sleep all day while she and her husband were at work. Often, he would walk around

---

4. The gas station in question is referred to at various times in the transcripts as a BP station or an Amoco station. For the sake of clarity, we shall call it a BP station.

5. Mrs. Buck died on May 4, 2005, of a pulmonary embolism that developed after an ankle fracture.

the neighborhood at night. Mrs. Buck also told the detectives that, recently, Buck had not been taking his medications. The detectives also learned that both she and Mr. Buck worked during the day and were gone from the home by 9:00 a.m. on weekdays, leaving their son alone in the house at that time.

On the morning of the next day, March 2, 2005, the detectives investigating the Baroody murder sought and obtained a search warrant for Buck's house. The warrant authorized the seizure of, among other things, knives and clothing. The detectives did not execute the warrant immediately, however.

In the early afternoon of that same day, Detective Piazza and Detective Shane Knowlan, wearing plain clothes, drove to Buck's house in an unmarked car. Detective Piazza had talked to Detective Minor previously and knew what Mrs. Buck had told him. Detective Piazza planned to have the search warrant executed when Buck was not at home.

The detectives arrived at about 12:45 p.m. and found Buck at home. He was wearing shorts and a T-shirt. Detective Piazza asked if Buck would be willing to come to the Sheriff's Office Headquarters ("the station house") in La Plata for an interview in connection with the Baroody murder. Detective Piazza told Buck that he would not be under arrest and would be free to leave at any time. He testified: "All he had to do was say the word and I would bring him home. And since, I told him that, I would not be arresting him."

Buck responded that he had to change his clothes before leaving. Detective Piazza followed him upstairs to his bedroom and watched as he got dressed. Detective Knowlan remained at the bottom of the steps. After Buck had put on clothes, he and the officers went outside. Buck got in the front passenger's seat of the police cruiser and put his seat belt on. He was not handcuffed or restrained. Detective Piazza drove and Detective Knowlan sat in the seat behind Buck.

During the 30–minute drive from Buck's house to La Plata, Detective Piazza asked Buck about his family, friends, and daily activities. Buck answered the detective's questions. At

some point, the conversation turned to the Baroody murder. Buck mentioned that a clerk at the BP station had commented that he (Buck) resembled the suspect the police were looking for. Detective Piazza asked Buck if he thought of himself as a suspect. Buck replied, "I hope I'm not a suspect," and then paused and said, "because I didn't do it." Detective Piazza noticed a faint odor of alcohol and asked Buck how much he had had to drink that day. Buck responded that he had had one beer that morning. Buck said he was not intoxicated, and Detective Piazza did not observe any signs of intoxication.

When the officers and Buck arrived at the station house, Buck was taken to an interview room in a secure part of the building. He was given a pass that permitted him to walk within the station house only if escorted by an officer. The interview room was 10 feet by 10 feet and had two chairs and a table. There were no windows. There was a one-way mirror by which the detectives could see into the room without being seen. There also was a camera in the ceiling that allowed occupants of another room to watch and hear the interview on a monitor.

The interview lasted five hours, from 1:20 p.m. to 6:20 p.m. There were times when Buck was alone in the interview room. Otherwise, he was accompanied by at least one officer, and more often by two.[6] He never was physically restrained and no weapons were displayed or drawn. Buck did not ask to call anyone.

Detective Piazza began the interview. He asked Buck how he felt and inquired about the last time he had taken his medications. Buck responded that he had taken his medications "last night" and that he felt okay, "just anxious." The detective asked Buck if he "wanted a drink or needed a restroom"; he responded no. Detective Piazza spoke with Buck about his family and friends and then turned his attention to the night of February 27, 2005. Initially, Buck said his

---

6. According to Detective Minor, Buck would not have been accompanied by an officer to the restroom. The record does not reveal whether he used the restroom, however.

only activity that night was to walk to the BP station to buy cigarettes. Detective Piazza told Buck he had reviewed the BP station's surveillance tapes from that night and they did not show him there. Buck became "noticeably . . . uncomfortable at that point." Detective Piazza went on to say that the police were at that very moment executing a search warrant for Buck's house, looking for evidence related to the murder, particularly Baroody's DNA. The detective asked Buck if he thought the police would find any evidence of the murder at his house. Buck responded, "I don't think so" or "I doubt it."

Buck asked for a break so he could smoke a cigarette. Detective Piazza instructed Detective Shankster[7] to accompany him. He told Detective Shankster that Buck was not under arrest and that the detective should "let [Buck] out the door and [ ] let him in when he was done" smoking. Detective Piazza further informed Detective Shankster that, if Buck asked to leave, he (Detective Piazza) would give him a ride home. Although the evidence on this point is unclear, it appears that this conversation did *not* take place in Buck's presence.

When Buck returned from the cigarette break, he asked Detective Piazza if the police had found anything when they executed the search warrant. The detective responded by asking Buck what *he* thought the police might have found. Buck responded, "my pants." Detective Piazza then asked for, and Buck agreed to give, a DNA sample. At that point, Detective Piazza left the interview room.

Soon thereafter, at about 4:25 p.m., Detective Minor entered the interview room and spoke to Buck about signing a consent form for the DNA sampling. Detective Minor used a buccal swab to collect the sample from inside Buck's cheek. Buck mentioned that, when the police had interviewed him on the street, he had overheard Detective Minor say, "I think we got him." He said he took that to mean that the officers thought he had killed Baroody. As Detective Minor collected the

---

7. Detective Shankster's first name does not appear in the record.

sample, he told Buck that he had spoken with Mrs. Buck the night before. Detective Minor commented that he himself had thought about killing people before. He asked Buck whether he had ever "thought about killing people." Buck said he had not.

Detective Minor then asked Buck "how it felt to kill that man," meaning Baroody. Buck proceeded to confess to the murder. He told the detective that, on the evening of February 27, 2005, he was "pumped up" from listening to rap music all day. He had not taken his medications. He decided to carry a kitchen knife with him on his nightly walk. He stabbed Baroody with the kitchen knife, killing him, because Baroody looked like an "easy target." His hands had shaken when he stabbed Baroody. He did not rob Baroody. Afterwards, he ran home, washed the blood off the knife, and put it back in the knife block where he had found it. He vomited, smoked some cigarettes, and went to bed. Buck told Detective Minor that right then (during the interview) he was wearing the same sweatshirt and shoes he had worn when he stabbed Baroody.

Detective Minor left the interview room and told Detective Piazza that Buck just had confessed to the murder. Detective Piazza directed Detective Bean to begin drafting a statement of charges for an arrest warrant for Buck. Detective Piazza then rejoined the interview. When Detective Piazza walked into the interview room, Buck apologized for lying to him, saying, "I wanted to tell you the truth, but I felt bad." Buck shook Detective Piazza's hand. At that point, the detectives took Buck's sweatshirt and shoes and gave them to another officer. It is not clear from the hearing testimony whether Detectives Minor and Piazza asked Buck's permission to take his sweatshirt and shoes or whether they directed him to remove those items of clothing. Both detectives testified, however, that during the interview neither one "ordered" Buck to do anything.[8]

---

8. The record does not reveal whether Buck was given replacement clothing.

Buck asked for another cigarette break. This time, Detective Minor and Detective Moody accompanied him outside. Detective Minor asked Buck to describe how he had stabbed "the old man." Buck proceeded to physically re-enact the stabbing. With Detective Minor pretending to be Baroody, walking slowly down the street, Buck demonstrated how he had approached Baroody quickly from behind and stabbed him once in the upper back.

At about 5:00 p.m., when the detectives and Buck returned to the interview room from the cigarette break, Detective Piazza took a written statement from Buck about the Baroody killing. Detective Piazza would type a question, Buck would answer it, and Detective Piazza would type in Buck's answer. He and Buck then reviewed the statement, page by page, and signed it. (Detective Piazza signed it as well.)

The first question, to which Buck answered, "Yes sir," was: "Do you understand that you are not under arrest and are free to leave at anytime?" When asked why he had killed Baroody, Buck said, "I was angry. I wasn't planning on killing anyone. I just thought if anyone came, I would stab him." Buck said he had not taken his medications on the day of the stabbing and that "his nerves hurt." He identified his medications as "Rispodal [sic], Luvox, and Norotin." He described how he walked up behind Baroody as Baroody was standing looking at a "For Sale" sign and stabbed him in the back. Baroody fell down, with the knife in his back. Buck removed the knife and ran home. He had blood on his shoes. He washed the knife off and put it back inside the knife block. He used toilet paper to wash the blood off his shoes. The second to last question to Buck was: "When I met you at your house earlier today I told you that you did not have to come with me or talk to me. Is that correct?" Buck answered, "True."

After the statement was signed, Detective Piazza showed Buck a photograph, taken when the search warrant was executed, of the knife block and various cutlery in the kitchen at his house. He asked Buck to point out the knife he had

used to stab Baroody. Buck circled one of the knives in the photograph and signed his name next to it.

Detective Piazza told Buck he was not under arrest. He instructed Detectives Minor and Moody to drive Buck home. During the drive, Detective Minor asked Buck to show him where the stabbing occurred. Buck directed Detective Minor to the exact location where Baroody's body had been found.

The detectives accompanied Buck inside his house. In front of Buck's family members, Detective Moody asked Buck if he had killed Baroody. Buck nodded yes. At about 6:50 p.m., the detectives left the Bucks' home. They stayed in the neighborhood, however. Before Buck's arrival home, at Detective Piazza's direction, plainclothes police officers had positioned themselves outside the house. Detective Minor called Detective Piazza to say that Buck had been dropped off at home and it was time to submit the application for arrest warrant for approval. An arrest warrant for Buck was issued by a court commissioner at 7:07 p.m. Minutes later, Detective George Higgs, one of the officers staked out near Buck's house, received a radio communication instructing him to arrest Buck, which he did. Thus, a little less than 20 minutes elapsed from the time the officers left Buck at his house until the time Buck was arrested.

When arresting Buck, Detective Higgs spoke to Buck's parents. They told him he was on several medications. Buck was handcuffed and driven to the Charles County Detention Center, also in La Plata.

As Detective Higgs was processing Buck's paperwork, Buck asked if they could speak in private. Detective Higgs escorted Buck to an interview room and advised him of his *Miranda* rights by reading them to him from a card.[9] This was the first time in the course of the investigation that Buck was given *Miranda* warnings. Detective Higgs asked Buck if he understood his rights and wanted to answer some questions.

---

**9.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Buck responded yes to both questions. He then denied any involvement in Baroody's death and asked to speak to the investigating detectives. Detective Higgs returned Buck to the processing area.

Detective John Elliott took over processing Buck. He took Buck to an interview room, read him his *Miranda* rights, and asked him if he understood those rights. Buck said yes and further stated that he knew he had "the right to remain silent." Detective Bean joined the interview. Buck agreed to speak with the detectives and claimed that he had initially confessed to killing Baroody because "Detective Piazza had hounded him." Detective Elliott asked Buck if Detective Piazza had threatened him or otherwise treated him unfairly. Buck responded that "he was treated fairly, and that during the interview he knew he was there voluntarily." Detective Elliott then said, "There's a lot of other things here other than your statement alone to Detective Piazza. There's physical evidence and a lot of other things here that indicate that you committed this." At that point, Buck "put his head down and said, 'I told the truth.' "[10]

Detective Elliott then asked Buck whether the details of the demonstration he had given Detective Minor earlier that day were accurate. Buck replied, "yes." Detective Bean asked Buck whether "he had taken his medications." Buck responded that he had not taken his medications on February 26 and February 27, 2005. During the interview, Buck asked to take his medications on "several occasions," but the detectives did not halt the interview to retrieve the medications. Detective Bean further asked whether Buck had told his parents that he had killed Baroody. Buck responded that he had told his parents initially that he did not kill Baroody but later told them that he in fact had done so.

---

**10.** It appears from the record that Detective Elliott did not specify for Buck the "physical evidence" and "other things" he was speaking of. At trial, the State introduced evidence that DNA found on the knife Buck indicated he had used to kill Baroody was consistent with Baroody's DNA.

On April 12, 2005, Buck moved to suppress the statements he made to the police in his first interview on March 2, at the station house and during the drive to and from, on the ground that they were obtained by custodial interrogation, but without *Miranda* warnings. He further moved to suppress the statement he made to the police in his second interview that day, after he was arrested, at the detention center, on the ground that, although he was given *Miranda* warnings, his statement was elicited in violation of the principles in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004); and also on the ground that they were involuntary.

At a suppression hearing on October 19, 2006, the State called Detectives Minor, Piazza, Higgs, and Elliott to testify. The defense did not call any witnesses.

When Detective Piazza was asked on cross-examination why he had chosen not to arrest Buck at the station house, when Buck confessed to killing Baroody, the detective replied, "I promised that I wouldn't arrest [Buck] that day if he comes down and talks to us." On redirect, the detective clarified that he did not remember using the word "promise" in speaking with Buck. He had only meant to say that he had "assured" Buck that he was not going to be arrested that day.

Defense counsel pressed Detective Piazza as to why he had not read Buck his Miranda rights at the outset of or at some time during the interview at the station house. The following colloquy ensued:

[DEFENSE COUNSEL]: Why did you not read [Buck] his *Miranda* rights [before or during the initial interview], sir?

WITNESS OFFICER PIAZZA: He came voluntarily.

[DEFENSE COUNSEL]: Okay. Was that a procedure that had been discussed among the members of the Sheriff's Department on how to conduct interviews in general?

WITNESS OFFICER PIAZZA: I don't know how that came about. It's just one of the ... one of the ways we do it, either in custody or voluntary.

[DEFENSE COUNSEL]: Okay. And, so one of the ways is to, as you've already talked about, tell someone that

they're not under arrest; bring them down; interview them without the benefit of *Miranda;* bring them home; and then arrest him with a warrant. That's the procedure you follow?

WITNESS OFFICER PIAZZA: It has happened before.

In response to a similar line of questioning as to whether it was standard practice of the Sheriff's Office to allow a confessed killer to "wander free on the streets of Charles County," Detective Minor said, "We've done it in the past."

The court reserved decision at the close of the hearing and offered counsel the opportunity to submit memoranda of law, which they did. Thereafter, at the outset of the first day of trial, the court denied the motion to suppress. The court ruled that Buck had not been "in custody" during the station house interview, and therefore did not need to be read his *Miranda* rights. Specifically, the court stated:

I find that Mr. Buck was not in custody; that these officers would not have arrested Mr. Buck if he had begged them to do so under these circumstances. He has no right to be arrested. I do find [the police] took care, almost textbook care, to ensure that he was not in custody. . . .

Having so ruled, the court did not reach the question whether the holding in *Missouri v. Seibert* applied to exclude Buck's post-arrest, warned confession. The court also found that Buck's statements to the police were freely and voluntarily made.

On appeal, Buck first argues that his statements during the initial, unwarned, interview with Detectives Minor and Piazza were the product of custodial interrogation, but without the benefit of *Miranda* warnings, and therefore were inadmissible. Second, Buck argues that the process by which he was subjected to custodial interrogation without *Miranda* warnings, released from custody, and then arrested minutes later was a deliberate two-step police strategy carried out to render ineffective the *Miranda* warnings he then was given before the second interview, and hence was prohibited by *Missouri v. Seibert, supra.* Therefore, his post-*Miranda* warnings state-

ments also were not admissible. Independent of those grounds for suppression, Buck also argues that his statements were involuntary because they were improperly induced by Detective Piazza's "promise" that he would not be arrested if he came to the Department; and because he was not on his medications and had told the detectives that he "wasn't feeling right," but the detectives improperly "blurred through a reading of the *Miranda* warning in about twenty seconds."

## (A)

### *Admissibility of Unwarned Statements— Miranda "In Custody" Issue*

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that before a person is subjected to custodial interrogation by a government agent, he must be advised of certain important legal rights, including the right to remain silent. *Id.* at 444–45, 86 S.Ct. 1602. In the case at bar, there is no dispute that, on March 2, 2005, when Buck was questioned by various detectives during the ride to the station house, at the station house, and during the ride home from the station house, he was being interrogated. The point in dispute is whether, at those times, Buck was "in custody." If indeed he was, the detectives violated the rule of *Miranda* by not advising him of his rights before interrogating him. Buck challenges the circuit court's ruling that he was not in custody during those critical interrogation periods and therefore did not have to be *"Mirandized"* before speaking with the police.

Whether a person is "in custody" for *Miranda* purposes is an objective inquiry that is to be made based upon the totality of the circumstances. *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Beckwith v. United States*, 425 U.S. 341, 346–47, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). *See also Argueta v. State*, 136 Md.App. 273, 282, 764 A.2d 863, *cert. denied*, 364 Md. 142, 771 A.2d 1071 (2001). A court's examination of the totality of

**608**

the circumstances must be informed by the underlying purpose of the *Miranda* rule, namely to protect individuals from compelled self-incrimination. *Berkemer v. McCarty,* 468 U.S. 420, 433, 437, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

In *Owens v. State,* 399 Md. 388, 924 A.2d 1072 (2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1064, 169 L.Ed.2d 813 (2008), the Court of Appeals gave the following overview of the law of "custodial interrogation" under *Miranda:*

> A significant body of law has developed around the questions of what constitutes "custody" and "interrogation" for Fifth Amendment purposes. The *Miranda* Court defined "custodial interrogation" as "questioning initiated by the law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. 1602. "Custody," though typically associated with formal arrest or incarceration ..., is not always so clearly a delineated concept. The Supreme Court declared in *California v. Beheler* that "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' *of the degree associated with a formal arrest."* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711) (emphasis added). In fact, a person is considered "in custody" when "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *see also Yarborough v. Alvarado,* 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *accord* [*State v.*] *Rucker,* 374 Md. [199], 209, 821 A.2d 439 [(2003)]; *Whitfield v. State,* 287 Md. 124, 141, 411 A.2d 415 (1980).

\* \* \* \*

■ The question of whether a suspect is "in custody" is determined objectively, to the exclusion of the subjective intent of law enforcement, in light of the totality of the circumstances of the situation. [*Yarborough,*] 541 U.S. at 667, 124 S.Ct. 2140; *Stansbury,* 511 U.S. at 323, 322, 114

S.Ct. 1526; *accord Whitfield*, 287 Md. at 140, 411 A.2d 415. Among the circumstances which should be considered in determining whether "custodial interrogation" took place are:

> when and where [the interrogation] occurred, how long it lasted, how many police were present, what the officers and defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning[,] whether he came completely on his own, in response to a police request or escorted by police officers. Finally, what happened after the interrogation whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

399 Md. at 427–29, 924 A.2d 1072 (quoting *Whitfield, supra*, 287 Md. at 141, 411 A.2d 415, in turn quoting *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979)) (further citations omitted). On review of a circuit court's suppression motion ruling on the issue of custody for *Miranda* purposes, we accept the factual findings of the court, unless clearly erroneous, but determine *de novo* the constitutional significance of those findings, *i.e.*, whether on the facts as found, the defendant was or was not "in custody." *Owens, supra*, 399 Md. at 403, 924 A.2d 1072. As noted, in the case at bar, only the State called witnesses to testify at the suppression hearing; Buck did not testify himself, and called no witnesses. The first-level factual findings as adduced at the suppression hearing were not disputed.

### (i)

Buck maintains that his mental illness, which was known to the investigating officers through their communications with his mother, was a factor that should have been considered by

the court in deciding whether he was "in custody" and, had it been considered, would have militated strongly in favor of a finding that indeed he was in custody. The court erred, he argues, by not considering his mental illness in reaching its ultimate "not in custody" decision.

Buck's assertion that the circuit court should have considered his mental illness in deciding the issue of custody, and should have concluded that a person in his situation, with his mental illness, would have believed he was not free to leave, is not supported by Supreme Court precedent.

In *Yarborough v. Alvarado, supra,* 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938, Alvarado petitioned for federal *habeas corpus* relief, arguing for vacation of his convictions for murder and attempted robbery on the ground that the state trial court allowed into evidence a statement he gave to the police without being advised under the rule of *Miranda.* The question before the Supreme Court was whether the trial court had considered the proper factors and reached a reasonable conclusion that Alvarado was not in custody during his police interview.

Alvarado, just short of his 18th birthday, and a friend, Paul Soto, were mingling among a large group of teenagers in a shopping mall parking lot when Soto, who was armed with a handgun, decided to steal a truck. Alvarado agreed to help. Soto approached the driver of the truck, demanding money and the keys to the truck. When the truck driver refused, Soto shot and killed him. Alvarado helped hide the murder weapon.

About a month after the murder, the lead detective on the case "left word" at Alvarado's house, and with his mother at work, saying the police wanted to speak to him. During a lunch break on a day soon thereafter, Alvarado's parents drove him to the police station to be interviewed. Alvarado asked for his parents to be able to sit in on the interview, but his request was denied. He was taken to a small interview room.

Questioning started at about 12:30 p.m. The interview, which was recorded, was about two hours long. Alvarado was

not advised of his *Miranda* rights. Only the lead detective and Alvarado were present in the room. The detective asked Alvarado to recount the events of the night of the shooting. Alvarado said he had been drinking alcohol at a party at a friend's house; and that a few hours later, a part of the group went home and the rest, including him, walked to the mall to use the pay telephones. At first, he ended the story there. When pressed, he eventually acknowledged being present when another person, whom he later admitted was Soto, tried to highjack a truck; that he knew Soto was armed but did not expect him to kill anyone; and that, after the shooting, he helped Soto discard the murder weapon. When the interview was almost over, the detective asked Alvarado if he needed a break. He said no. The detective then returned Alvarado to the lobby, where his parents were waiting. His father drove him home.

A few months later, Alvarado and Soto were charged with first degree murder and attempted robbery. Alvarado moved to suppress his statements to the lead detective on Miranda grounds. In an evidentiary hearing, he agreed that his conversation with the detective was "pretty friendly" and that he "did not 'feel coerced or threatened in any way'" during the interview. 541 U.S. at 658, 124 S.Ct. 2140 (quotation to the record). The motion judge ruled that the interview was noncustodial. Alvarado was convicted and the convictions were affirmed on direct appeal. In a *habeas corpus* proceeding in the federal district court, the court agreed that Alvarado had not been in custody during the interrogation.

The Ninth Circuit Court of Appeals disagreed. It held that the state court had erred by not taking into account Alvarado's "youth and inexperience when evaluating whether a reasonable person in his position would have felt free to leave," and that "the effect of [Alvarado's] age and inexperience was so substantial that it turned the interview into a custodial interrogation." *Id.* at 659–60, 124 S.Ct. 2140 (discussing *Alvarado v. Hickman*, 316 F.3d 841 (9th Cir.2002)).

The Supreme Court reversed the Ninth Circuit. It rejected the argument that a defendant's particular characteristics (in

that case young age and inexperience with the law) must be factored into the decision whether he was "in custody," under the rule of *Miranda*, when he was interrogated. Emphasizing that its "more recent cases instruct that custody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances," the Court held that the objective test for custody under *Miranda* does not " 'place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question.' " *Yarborough*, 541 U.S. at 662, 124 S.Ct. 2140 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, n. 35, 104 S.Ct. 3138, 82 L.Ed.2d 317, in turn quoting *People v. P.*, 21 N.Y.2d 1, 9–10, 286 N.Y.S.2d 225, 233 N.E.2d 255 (1967)). *See also Beheler, supra*, 463 U.S. at 1123–24, 103 S.Ct. 3517 (holding that how much interrogating police officers knew about the suspect and how much time had elapsed since the crime occurred were not relevant to issue of custody); *Stansbury, supra*, 511 U.S. at 323, 114 S.Ct. 1526 (stating that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned"). The Court reaffirmed its "in custody" test as described in *Thompson v. Keohane, supra*, 516 U.S. at 112, 116 S.Ct. 457:

> Two discrete inquiries are essential to the determination [of custody]: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

541 U.S. at 663, 124 S.Ct. 2140.

The Ninth Circuit had framed the "objective" custody issue in the case as what a "reasonable 17–year–old, with no prior history of arrest or police interviews," would perceive. 316 F.3d at 854–55. The Court rejected that effort to "subsume a

subjective factor into an objective test by making the latter more specific in its formulation," 541 U.S. at 667, 124 S.Ct. 2140. It reasoned that the *Miranda* "custody inquiry states an objective rule designed to give clear guidance to the police, while consideration of a suspect's individual characteristics— including his age—could be viewed as creating a subjective inquiry." *Id.* at 668, 124 S.Ct. 2140. The Court explained that it would be improper to consider a suspect's prior history with law enforcement in deciding the issue of custody because, "[i]n most cases, police officers will not know a suspect's interrogation history, . . . [and] [e]ven if they do, the relationship between a suspect's past experiences and the likelihood a reasonable person with that experience would feel free to leave often will be speculative." *Id.*

■ The holding in *Yarborough* cuts strongly against Buck's argument that, in deciding whether he was "in custody," within the meaning of that phrase in *Miranda* jurisprudence, during the initial unwarned interrogation, the circuit court should have taken into account his mental illness, asking, in effect, whether a reasonable mentally ill person in Buck's position would have felt free to terminate the interrogation and leave. To be sure, the interrogating officers knew that, according to Mrs. Buck, Buck had been suffering "severe depression" for several years and had been prescribed medications for that condition. As we shall discuss, *infra*, that factor is one of many relevant to whether Buck's confessions were voluntary. Under Supreme Court case law, however, notwithstanding that Buck had been diagnosed with and was being treated for depression, the *Miranda* custody issue before the circuit court remained whether a reasonable person in Buck's position—not a reasonable person experiencing depression or other mental illnesses—would have felt free to break off questioning and leave. The court did not err in the standard it applied in answering that question.

### (ii)

Buck's more general *Miranda* "in custody" argument is that, when considered in light of the factors relevant to the

question whether custody exists, the facts in the suppression hearing record cannot reasonably yield the conclusion that he was *not* "in custody" when he made his initial unwarned statements to the police. In other words, applying a strictly objective test, as mandated by the Supreme Court, on the facts as established at the suppression hearing, it is unreasonable to conclude that a reasonable person in his position would have felt free to terminate the interrogation and leave; therefore, he was "in custody" during the initial, unwarned interrogation. In advancing this argument, Buck places most reliance upon *Bond v. State*, 142 Md.App. 219, 788 A.2d 705 (2002).

*Bond* is readily distinguishable. There, witnesses saw Bond crash his vehicle into two cars, causing damage, and then leave. The police were called and from information gathered at the scene determined that Bond lived at a particular address in a trailer park. Three uniformed and armed officers went to the trailer and were let in by Bond's 11 year old nephew, who was the only occupant of the trailer other than Bond. Bond was in his bedroom, undressed and in bed. The three officers entered the bedroom and stood in between the bed and the door. Bond was awake. The officers questioned him about the hit and run incident. They did not give him *Miranda* warnings or tell him he did not have to speak with them or could tell them to leave. At the end of the interrogation, the officers told Bond they were not placing him under arrest right then and there because, if they did so, there would be no adult to care for the 11 year old.

On appeal after conviction, this Court held that Bond was "in custody," for *Miranda* purposes, when he was questioned in his bedroom:

> We must determine, from an objective standpoint, and keeping in mind the underlying purpose of the *Miranda* decision, whether there was a coercive aspect to the circumstances in which [Bond] was questioned, so as to constitute custodial interrogation. We conclude that the factors relevant to this analysis point strongly in favor of [Bond's] being

in custody when he was questioned by [the officer] in the bedroom of his trailer home.

The interrogation ... took place late at night in [Bond's] bedroom, with [Bond] in bed and partially clothed. To be sure, the questioning did not occur in the potentially coercive atmosphere of a police station, or of a strange and unfamiliar location. It ran to the other extreme, however. Whether [Bond] was awake or asleep when the officers entered his bedroom, the highly private location of the interrogation, the late hour, [Bond's] state of undress, the number of officers present, and the accusatory nature of the questioning were such that an ordinary person in the circumstances would be intimidated, and would not think he could end the encounter merely by telling the officers to leave.

The interrogation ... was the polar opposite of the questioning that accompanies a traffic stop, which is expected, takes place in a public or semipublic place, and is mutually understood to be brief. The ordinary person does not expect his friends or neighbors, let alone police officers, to appear in his bedroom late at night. There is a world of difference between a person being questioned during normal daytime hours, at his dining room table, in a relaxed atmosphere (such as in *Beckwith* [*v. United States, supra*]), and a person being questioned late at night, in bed, undressed, by three officers blocking the bedroom door (as in this case). Moreover, unlike the routine traffic stop, which is a "known quantity" to most people, the unusual nature of the interrogation in this case was such that [Bond] would have had no way of gauging how long the questioning was going to continue. The atmosphere in which the interrogation in this case was conducted was one of pressure, accusation, and uncertainty that would lead a reasonable person to believe that silence was not an option.

142 Md.App. at 233–34, 788 A.2d 705.

Buck argues that, because Detective Piazza accompanied him to his bedroom when he got dressed, his case is analogous to *Bond.* We disagree. The detectives went to Buck's house

after already meeting and talking to him on the street the day before. It was mid-day and Buck let them in the house. Detective Piazza did not ask any questions of Buck as Buck was putting on clothes. He told Buck he was not under arrest and did not have to go to the station house with the officers for questioning. Other than the fact that a police officer was present in the defendant's bedroom, with the defendant present, the circumstances in *Bond* have little in common with the circumstances in the case at bar.

In arguing that, under the objective totality of the circumstances test, Buck was not in custody, the State relies upon this Court's opinions in *Minehan v. State,* 147 Md.App. 432, 809 A.2d 66, *cert. denied,* 372 Md. 431, 813 A.2d 258 (2002), and *Ashe v. State,* 125 Md.App. 537, 726 A.2d 786, *cert. denied,* 354 Md. 571, 731 A.2d 969 (1999). In both cases, we held that a defendant was not "in custody" when he was interrogated by police, even though the interrogation took place at a police station.

In *Minehan,* in the course of investigating a string of robberies, the police developed Minehan as a suspect. Minehan also was the alleged victim of a supposed "robbery" of the florist store at which he worked. The police decided to question him about the supposed "robbery" as a means to pursue further questioning about the other robberies. After ascertaining Minehan's work schedule, three officers in plainclothes appeared at the store at 8:30 a.m. one day and asked to speak with him at the police station about the florist store robbery. He agreed. The officers then "followed him around the shop as he completed his work and walked out with him." 147 Md.App. at 439, 809 A.2d 66. Although Minehan had driven to work, he accepted the officers' offer to drive him to the police station. One officer patted him down before he got into the police vehicle, which was unmarked.

At the police station, the officers took Minehan to a room used for interviewing victims and witnesses. Another room, designated for suspects, was not used. Minehan sat at the head of a long table, with three officers facing him. The

interview, which was taped, lasted one hour and 45 minutes, with a 20–minute cigarette break. Minehan started making incriminating remarks about a quarter of the way into the interview. He was not given Miranda warnings at any time. After he confessed, the officers obtained his consent to go to his house right then to collect evidence. When that effort was not fruitful, the officers drove Minehan back to the florist store, to his car, and let him go. They arrested him one week later.

■■ This Court held that Minehan was not "in custody" for purposes of *Miranda* during the ride to the police station because he agreed to accompany the officers, was not restrained (except for the use of a seatbelt), "and the conversation in the car was unremarkable." *Id.* at 441, 809 A.2d 66. With respect to the interview at the police station, we observed that merely because a person is interviewed by officers in a police station setting does not mean that the person is in custody *per se. See Mathiason, supra,* 429 U.S. at 495, 97 S.Ct. 711 (holding that suspect who was questioned in isolation for 30 minutes in police station was not "in custody," as he had agreed to go to the police station for questioning). In addition, it is an established rule "that police do not violate *Miranda* by telling the accused he or she is only a witness, when, in fact, the person is a suspect." *Minehan, supra,* 147 Md.App. at 442, 809 A.2d 66 (citing *Mathiason, supra,* 429 U.S. at 495–96, 97 S.Ct. 711 and *Beckwith, supra,* 425 U.S. at 347, 96 S.Ct. 1612). We went on to comment as follows about the fact that Minehan was released at the end of the interview instead of being placed under arrest:

> [T]here is rarely custody when the person questioned leaves the interrogation unencumbered, only to be arrested at a later time. *See Bartram v. State,* 33 Md.App. 115, 148–49, 364 A.2d 1119 (1976) [*aff'd,* 280 Md. 616, 374 A.2d 1144 (1977)]; *Cummings [v. State],* 27 Md.App. [361,] 378–79, 341 A.2d 294[, *cert. denied,* 276 Md. 740 (1975)]; *see also United States v. Scully,* 415 F.2d 680, 683–84 (2d Cir.1969) (holding that accused was not in custody when asked to go to the police station and left the station freely); *United States v.*

*Manglona,* 414 F.2d 642, 644 (9th Cir.1969) (holding that accused was not in custody when told he was not under arrest and was free to leave, and did in fact freely leave the interview); *State v. Patterson,* 146 N.C.App. 113, 552 S.E.2d 246, 252–54 (2001) (holding that accused was not in custody when asked to "give his side of the story" and then left the station unencumbered).

*Minehan, supra,* 147 Md.App. at 442, 809 A.2d 66.

After reasoning that all of the above factors weighed against "custody," we noted as well that Minehan had said, at the outset of his interview, that he had come to the police station of his own free will; that the officers had told him at that point that he was free to leave and did not have to answer any questions; and that, before he confessed, he again was told that he was not under arrest and could leave without saying anything. After the confession, Minehan was told he was not under arrest and that the police probably would contact him in the future to "maybe discuss things here." *Id.* at 443, 809 A.2d 66. These factors likewise weighed against a determination of custody.

Finally, we commented as follows about the intentions of the police in bringing Minehan in for questioning:

> We recognize that bringing Minehan to the police station to discuss the [florist store] robbery was clearly a subterfuge for extracting a confession from him. Furthermore, once the officers shifted the interview from the [florist store] robbery to Minehan's alleged criminality, the pressure in the room increased, a change that was palpable from reading the transcripts and which was captured by Minehan's anxious question, "What is happening to me?" With a slightly different set of facts, this police action would have jeopardized the admission of the entire confession: it was a risky enterprise. Given Minehan's unencumbered departure and his statements on the record, how ever, we uphold admission of the confession, after all.

*Id.*

In *Ashe v. State, supra,* 125 Md.App. 537, 726 A.2d 786, a victim was beaten to death by an angry mob of people. Two

days later, investigating officers went to Ashe's house and asked him to go with them to the police station for an interview. Ashe was told he was not a suspect in the murder (although, in fact, he was). He rode to the station house in the police cruiser; the trip was three to four minutes long. He was told he was not under arrest and would be free to leave at any time. Under questioning, without *Miranda* warnings, he made incriminating statements. The interrogation lasted one and one-half hours.

After Ashe was charged, he moved to suppress the statements, on the ground that they were obtained by custodial interrogation, without *Miranda* warnings. Specifically, he argued that, when the police told him he was not under arrest and was free to leave, he thought that meant that he could leave after giving a statement. The suppression court found that he was told no such thing and that a reasonable person in his situation would not have thought that his freedom was restricted and that he could not end the interrogation and leave. This Court affirmed on that point.

Another case that bears some similarity to the case at bar is *Allen v. State*, 158 Md.App. 194, 857 A.2d 101 (2004), *aff'd*, 387 Md. 389, 875 A.2d 724 (2005). Like this case, *Allen* involved interrogations by members of the Charles County Sheriff's Department, at the station house, with an arrest following closely thereafter. At mid-morning one day, the Sheriff's Department received a telephone call from Allen, reporting that he had been assaulted the night before and had stabbed the man who assaulted him until the man stopped moving. He then had driven his car (which in fact belonged to the other man) and had crashed it into a ditch. Uniformed officers responded to Allen's location and found him partially clad and covered in blood. Without prompting, he reported that he did not know where he was or who the person he had stabbed was, and only knew that the incident had taken place in a shack on a hill. He volunteered to show the officers the shack. The officers handcuffed Allen and put him in a marked cruiser. He then directed them to the shack. An officer went inside and found the stabbing victim, who was dead. Allen

was not told that the victim was dead, however. He was uncuffed at that point.

One of the officers asked Allen if he would be willing to discuss the incident at the station house. The officer explained that Allen was not under arrest and was free to leave without discussing the incident. Allen agreed to accompany the officers. He sat in the front seat of the police car, restrained only by a seat belt. Upon arrival at the station house, he was taken to an interview room. At 10:55 a.m., one of the officers entered and repeated to Allen that he was not under arrest, was free to leave, and did not have to discuss the incident. Allen agreed to talk. He answered questions for two hours, in the course of which he confessed to stabbing the victim. During that time, he was given drinks and snacks, when he asked for them. The conversation between the officer and Allen was carried on in normal tones. The police took Allen's bloody clothing and gave him a prison jumpsuit to wear.

After Allen confessed, he was asked to give a written statement, to which he agreed. The process that was followed was the same as what transpired in the case at bar: the officer typed out the written questions and the answers as given. In the written statement, Allen agreed that he had been told before he came to the station house that he was not under arrest and was free to leave, and reaffirmed that he still had that understanding. The process of taking the written statement began at 12:56 p.m. and ended at 3:56 p.m. During that time, the police were obtaining an arrest warrant. After the written statement was complete, the officers offered to drive Allen home. He asked to be taken to his parents' house instead. The officers complied, and dropped Allen off, at 4:30 p.m. They took his shoes, which were bloody. Plainclothes police kept Allen's parents' house under surveillance. Fifteen minutes later, the police obtained the arrest warrant. They arrested Allen at 5:10 p.m.

This Court reviewed the factors that are important in deciding whether a person is in custody, and concluded, "[p]ur-

suant to the 'reasonable person' analysis ..., that the trial court was entitled to find from the evidence that [Allen] was not in custody during the [interview]." 158 Md.App. at 236, 857 A.2d 101. "Allen was advised that he was not under arrest, was free to leave, and did not have to 'discuss the incident' with the detectives." *Id.* With respect to the events following the interview, we observed:

[T]he *Whitfield* [*v. State, supra,*] Court suggested that events after a police interview, such as a formal arrest, may be relevant to the question of whether the suspect was actually in custody during a prior interview. In this regard, we are mindful that when the police transported [Allen] to his home, they already knew that they were going to arrest him as soon as possible. But, our focus concerns [Allen's] state of mind during the interview. [The interrogating detective] testified that, when he first encountered Allen, he knew little about the circumstances of [the victim's] death. In other words, [the detective] had not fixed on [Allen] as the culprit when the interview began. Rather, [Allen's] statements during the interview led [the detective] to believe [Allen] murdered [the victim]. That the sheriffs decided to monitor [Allen] after they drove him to his parents' house, because of what was learned during the interview, does not establish that a reasonable person would have perceived he was in custody while at the sheriff's office during the interview.

158 Md.App. at 235, 857 A.2d 101.

To be sure, there are aspects of the two main cases relied upon by the State, and *Allen*, that militate in favor of a legal finding that, considering the total circumstances, a reasonable person in Buck's position *would not* have thought he was "in custody" when he was interrogated by the detectives as he was being driven to the police station, while at the police station, and on the drive home from the police station. Buck agreed to accompany the officers when they appeared at his house. He was told then, and later confirmed in his written statement that he had been told, he was not under arrest and was free to leave. He was not physically restrained by

handcuffs or otherwise. The officers came to Buck's house in mid-day, in plainclothes, and transported him to the station house in an unmarked car. After confessing, Buck was not arrested at the station house. During his later, warned, interview, he said he knew he had been at the station house voluntarily.

There are other factors within the total circumstances to be considered here that militate in favor of a legal finding that a reasonable person in Buck's situation *would* have thought he was in custody from the time he was driven to the station house to the time he was returned to his house, however.

Buck knew, before he was questioned at the station house on March 2, 2005, that the police had targeted him as the murderer in the Baroody case. When the officers encountered Buck on the street, on March 1, 2005, the murder was discussed. In Buck's presence, Detective Minor telephoned Detective Piazza and said, "I think we got him"—a clear reference to Buck's being the person the officers thought had committed the murder. During the interrogation at the station house the next day, Buck reminded Detective Minor of that, and said he had taken those words to mean that the officers thought he had killed Baroody. Soon thereafter, Detective Minor asked Buck "how it felt to kill that man," and Buck proceeded to confess to the murder.

Just as a defendant's subjective belief as to whether he is in custody does not control whether, under the objective standard, he *is* in custody, neither does a police officer's subjective belief as to whether the defendant indeed committed the crime control the custody question. However, when an officer *articulates to the defendant* his belief that the defendant committed the crime, the custody inquiry is transformed, and becomes whether a reasonable person in the defendant's situation—*i.e., having been told by the police that they think he committed the crime*—would think he was free to break off the interview and leave. In *Stansbury v. California, supra,* 511 U.S. 318, 114 S.Ct. 1526 the Supreme Court held that "an officer's subjective *and undisclosed* view concerning whether the person being interrogated is a suspect is

irrelevant to the assessment whether the person is in custody." 511 U.S. at 319, 114 S.Ct. 1526 (emphasis added). Likewise, in *Berkemer v. McCarty, supra,* the Court held that, whether a motorist questioned in a roadside encounter with a police officer during a traffic stop was in custody did not depend upon the officer's intention—*not communicated*—to immediately take the motorist into custody and charge him with an offense.

The Court in *Stansbury* explained its reasoning in *Berkemer* as follows:

> [T]he officer "never communicated his intention to" the motorist during the relevant questioning. *The lack of communication was crucial, for under Miranda, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time"; rather, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."*

511 U.S. at 323–24, 114 S.Ct. 1526 (quoting *Berkemer, supra,* 468 U.S. at 442, 104 S.Ct. 3138) (emphasis added). The *Stansbury* Court went on to state:

> *An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her "freedom of action."* Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case. In sum, an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but

only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave....

511 U.S. at 325, 114 S.Ct. 1526 (emphasis added) (citation omitted).

Thus, in the case at bar, one factor in assessing the existence of custody *vel non* is that, when the officers were interrogating Buck on the drive to the station house, at the station house, and afterward, Buck knew, from what he had heard the officers say the day before, that they had targeted him as the murderer in the Baroody case.

Moreover, while at the station house, Buck gained additional knowledge, again from the police, that he was the focus of their investigation. During the interrogation, Detective Piazza told Buck that the police were in the process of executing a search warrant for Buck's house to look for evidence, in particular, Baroody's DNA. Unlike in *Allen,* in which the investigating officers had not identified the defendant as the culprit before interrogating him, and only focused their investigation on the defendant after he made statements that led them in that direction, here, the police were focused upon Buck as the killer before they took him in for questioning; he knew that because he heard them say it; and that knowledge was further confirmed for him when he was told that his house was in the process of being searched for physical evidence connecting him to the murder. *See also United States v. Jacobs,* 431 F.3d 99, 108 (3rd Cir.2005) (holding that, when defendant was summoned to the FBI office without explanation, was questioned in a confrontational manner about narcotics trafficking, and was told by the investigating agent that he thought she was guilty, she was "in custody," under the rule of *Miranda*); *United States v. Turner,* 761 A.2d 845, 853 (D.C. 2000) (holding that, once the defendant was told by the police that they had a warrant compelling him to submit to process to give hair samples and bodily fluids, he would have perceived that his circumstances had changed drastically and he was no longer free to leave).

In addition, Buck did not go to the station house to speak with the detectives completely on his own; nor did he contact them initially (as was the case in *Allen*). The detectives went to Buck's house, unannounced, at a time when (based upon their discussion with Mrs. Buck the day before), they knew he would be alone in the house, with his parents at work. They asked him to go to the station house to talk, in a circumstance in which he would not be in a position to have a parent or anyone else drive him to the station house and in which he did not have any other means of transportation. The drive from Buck's house to the station house in La Plata (and back) was 30 minutes. For six hours, Buck was never let out of a detective's sight, from the time the detectives entered his house at 12:45 p.m., until he was returned to his house at approximately 6:50 p.m. He was escorted closely at all times.

Buck did not freely leave the station house on his own. Interrogation continued during the drive home, with Buck's being asked to point out the location at which he stabbed Baroody. The detectives entered Buck's house when they picked him up and when they dropped him off, never leaving him alone. Indeed, the questioning continued in front of Buck's parents after he was taken home. Without question, it would have been most logical for the police to have ended the interrogation at the station house by placing Buck under arrest. He was driven home, only to be left with his parents and then arrested less than 20 minutes later (while under surveillance), simply so Detective Piazza could say he kept his end of the bargain with Buck by not arresting him on the spot. (According to Detective Piazza, he told Buck he would not be arrested that day—in fact, he was arrested that day, but at his house instead of at the police station.)

The interrogation at the station house lasted for about five hours, during which time Buck was not allowed to move about unescorted and was at all times being watched. He was escorted to and from his cigarette breaks by one sheriff's deputy on one occasion and by two sheriff's deputies on the other occasion. They monitored him during his two cigarette breaks and questioned him about his knowledge of the murder

during the second such break. In the course of the five-hour interrogation, Buck was asked accusatory questions, was told his house was being searched for evidence in the Baroody murder, was asked to give a DNA sample, and gave such a sample. He was shown a photograph of his kitchen, taken during the search of his house, and was asked to identify the knife he used to stab Baroody. Buck clearly was being interrogated as a suspect, not a witness, and, as stated above, *he* knew that and *the detectives* knew he knew that.

■ As Professor Wayne LaFave has pointed out in his treatise, Criminal Procedure (3rd ed. 2007), when a suspect has been told by the police, clearly and unequivocally, that he is not under arrest and can leave at any time, but the contemporaneous conduct of the police has the effect of nullifying that advice, the advice "will not carry the day." § 66(d) at 737 n. 57. *See United States v. Colonna,* 511 F.3d 431, 436 (4th Cir.2007) (FBI agent's initial advisement that the defendant was not under arrest was nullified by agent's executing a search warrant for the defendant's house early in the morning, escorting him to an FBI cruiser, and questioning him for three hours in the cruiser); *see also United States v. Warsame,* 488 F.Supp.2d 846, 860 (D.Minn.2007). In the case at bar, Buck was told three times over a six-hour period of being escorted by the police that he was not under arrest and was free to leave: 1) when the detectives picked him up at his house; 2) after he confessed orally and right before he signed his written confession; and 3) right before he was driven home. A reasonable person in Buck's situation would not think, however, based on the conduct of the officers, that he had the freedom to break off contact with the police.

■ The suppression judge found that, before his formal arrest, Buck was not "under arrest"; the detectives were not going to arrest him until after he had been driven home, even if he had asked to be arrested; Buck had no right to be arrested anytime before he actually was arrested; and the detectives took special care "to ensure that [Buck] was not in custody." As the cases make plain, custody is either a formal arrest or a situation that is tantamount to a formal arrest.

Regardless of what the detectives said about Buck's not being under arrest and being free to leave, and their efforts to create an interrogation that could be labeled non-custodial by the use of catchphrases and by going through the motions of taking Buck home before formally arresting him, any reasonable person in Buck's situation before he was formally arrested would have thought he was in police custody and did not have the freedom to cut off his interactions with the detectives. Accordingly, Buck's statements from the time he was driven to the police station on March 2 through the time six hours later when he was driven home and left (for 20 minutes) with his parents, were made in response to custodial interrogation. Because Buck was not given *Miranda* warnings during that time, the statements should have been excluded from evidence.[11]

### (B)

### *Admissibility of Warned Statements—Missouri v. Seibert*

In the circuit court, Buck argued that the inculpatory statements he gave at the detention center after he was

---

**11.** The State does not argue harmless error in its brief. Any such argument would be without merit, however. "In Maryland, an error is harmless if 'a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict.' " *Fields v. State,* 395 Md. 758, 764, 912 A.2d 637 (2006) (quoting *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976)). In finding Buck guilty of first-degree murder, the trial judge observed that, "[e]ven, however, arguendo [sic], if [Buck's] statements . . . were not considered as evidence in this case, there exists [a]mple evidence which established guilt beyond a reasonable doubt." However, when considering whether the murder was deliberate and premeditated, the trial judge relied at least in some part on Buck's pre-*Miranda* statements to the police. As described further in part II, *infra,* the judge stated that Buck's "recounting the [murder] in detail [to the police] indicates he was aware of this intent to kill" in finding that the murder was deliberate. Additionally, in finding that the murder was premeditated, the judge referred to certain pre-*Miranda* statements Buck had made including that he was angry and that he had planned to stab anyone he came across in walking that night. Given the court's reliance on these pre-*Miranda* statements, we cannot say that the admission of Buck's pre-*Miranda* statements "in no way influenced the verdict." Accordingly, we cannot find harmless error.

arrested and advised of his *Miranda* rights should have been suppressed from evidence, under *Missouri v. Seibert, supra,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643.

*Seibert* is a plurality opinion of the Supreme Court in which the concurring opinion of Justice Kennedy "set[ ] forth the narrowest grounds on which the case [was] decided" and therefore "represents the holding of the Court." *Cooper v. State,* 163 Md.App. 70, 91, 877 A.2d 1095 (2005). The Court held that, in the infrequent case in which interrogating officers use a two-step, "question first" technique "in a calculated way to undermine the *Miranda* warning," the warned statement is not admissible. 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring). At the *Seibert* suppression hearing, the interrogating officer testified that "he made a 'conscious decision' to withhold *Miranda* warnings [when questioning the defendant, who was in custody], thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer she's already provided once.' " 542 U.S. at 605, 124 S.Ct. 2601 (plurality opinion quoting appendix). The object of a deliberate two-step "question first" strategy "is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611, 124 S.Ct. 2601.

We applied the *Seibert* plurality holding in *Cooper.* There, it was undisputed that the defendant was in custody and was interrogated by a detective for 90 minutes without being given *Miranda* warnings. During the initial phase of the interrogation, the detective attempted to elicit an admission from the defendant that he was present at the scene and arguing with a murder victim at the time of the homicide. After 90 minutes, the defendant confessed to being at the scene of the murder when it took place. The detective then stopped the defendant from saying anything more, and for the next 20 minutes, set up an audiotape system, gave the defendant *Miranda* warnings, and secured a waiver of rights. The detective then began the second phase of the interrogation by referring back to the defendant's unwarned admission and having the defen-

dant repeat it, as if the two phases of the interrogation were one. During the suppression hearing, the detective candidly admitted that "he intentionally withheld the reading of the *Miranda* warnings during the first 90 minute stage of the interrogation, for fear that [the defendant] would refuse to talk or ask for a lawyer." 163 Md.App. at 94, 877 A.2d 1095. We concluded that the warned admissions were inadmissible under *Seibert.*

For the *Seibert* holding to apply at all, there must be an unwarned custodial interrogation followed by a warned custodial interrogation, carried out deliberately as a two-step "question first" process to undermine the effectiveness of the *Miranda* warnings given at the beginning of the second interrogation. In the case at bar, the trial court did not rule on the *Seibert* issue, having found that Buck was not in custody during his initial interrogation at the station house (and the drive to and from), before he was arrested. We have concluded, as explained, that Buck indeed was in custody during that time. On this record, however, it is plain that there was no evidence adduced at the suppression hearing that could have supported a reasonable finding that Buck's post-arrest warned statements were elicited in violation of *Seibert.*

Buck argues, in effect, that the temporal relationship of his unwarned and warned custodial interrogations, *i.e.,* that the warned interrogation followed the unwarned one in a short period of time, is sufficient to establish a violation of the holding in *Seibert.* Additionally, without any citation to the record, Buck states that his pre-arrest statements "were obtained as part of a deliberate plan to frustrate [his] right to be advised of his *Miranda* warnings" and therefore his post-arrest statements, made within an hour thereafter, were inadmissible under *Seibert.* Also without any citation to the record, Buck asserts that "the Charles County Sheriffs Department employed a plan which was calculated to produce the coercive effect and impact of custodial interrogation without having to risk informing the appellant of his rights under *Miranda."*

There is no record evidence that shows that the officers in this case employed a deliberate two-step "question first" policy, of the sort condemned in *Seibert* and *Cooper*. As we have explained, the initial interrogation of Buck took place at the station house, with the primary questioners being Detective Piazza and, later, Detective Minor. Once Buck confessed orally to Detective Minor, he was asked to give a written statement, which he did. For the reasons we have explained, Buck was in custody throughout that period. He was not given *Miranda* warnings at any time—including after his oral confession and before he made his written statement. In other words, there was no single interrogation broken into two phases, unwarned and then warned, which is the hallmark of the "question first" strategy. After Buck had been taken home and the arrest warrant was quickly obtained and served on him, he was transported to the detention center, not back to the station house.

Detective Higgs, who had not been involved in the questioning at the station house, arrested Buck and transported him to the detention center. At the detention center, while being processed, Buck asked Detective Higgs if he could speak to him. Thus, to the extent that questioning that first took place at the station house was resumed at the detention center, the resumption was prompted by Buck, not by the officers. If there had been a calculated two-step "question first" plan, the officers would have resumed the questioning on their own. Moreover, the break between the station house interrogation and the detention center interrogation, involving as it did the transport of Buck to his house, his arrest, and his transport to the detention center as a second location for interrogation, and the subsequent non-involvement of Detectives Piazza and Minor in the detention center questioning, all are facts that show that the police were not following a two-step "question first" policy.[12]

---

12. In one paragraph of his brief, without any legal citation, Buck argues that he was not properly *Mirandized* when he actually was given the *Miranda* warnings, because Detective Higgs quickly read the warn-

## (C)

### *Voluntariness of Statements*

As mentioned above, the trial court also ruled that Buck's statements to the police were voluntary. Buck challenges that ruling, arguing 1) that the statements made during the interrogation at the station house were induced by an improper promise, contrary to the holding of *Hillard v. State*, 286 Md. 145, 153, 406 A.2d 415 (1979), and its progeny; and 2) that all his statements were involuntary because he is mentally impaired; he said at one point that he "wasn't feeling right"; and, eventually (during the detention center interrogation), he asked for medicine that was not promptly provided.

A circuit court's decision as to whether a confession was given voluntarily "is a mixed question of law and fact" that we review *de novo*. *Knight v. State*, 381 Md. 517, 535, 850 A.2d 1179 (2004); *Winder v. State*, 362 Md. 275, 310–11, 765 A.2d 97 (2001). Our task on review is only " 'to judge the voluntariness of the confession based upon the clearly established facts and in accordance with proper constitutional standards.' " *Lodowski v. State*, 307 Md. 233, 252, 513 A.2d 299 (1986) (quoting *Jackson v. Denno*, 378 U.S. 368, 391, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)).

To be voluntary, and therefore admissible in evidence, a confession must satisfy the mandates of the federal constitution, the Maryland constitution and Declaration of Rights, and Maryland non-constitutional law. *Knight*, 381 Md. at 532, 850 A.2d 1179; *Winder, supra*, 362 Md. at 305–06, 765 A.2d 97.[13] Under Maryland non-constitutional law, a confession must be " 'freely and voluntarily made at a time

---

ings from a card. At the suppression hearing, Detective Higgs testified as to precisely the advice he gave when *Mirandizing* Buck, and it is clear from that testimony that all of the warnings that are supposed to be given under *Miranda* in fact were given. It is of no moment that Detective Higgs read those rights from a card.

**13.** Of course, as discussed above, the dictates of *Miranda* also must be satisfied.

when [the defendant] knew and understood what he was saying.'" *Hoey v. State*, 311 Md. 473, 481, 536 A.2d 622 (1988) (citation omitted). *See also Taylor v. State*, 388 Md. 385, 400–01, 879 A.2d 1074 (2005); *Knight, supra*, 381 Md. at 531–32, 850 A.2d 1179. Similarly, in order to pass federal and Maryland constitutional muster, a confession must be voluntary, knowing, and intelligent. *See generally Miranda, supra*, 384 U.S. at 444, 86 S.Ct. 1602; *Winder, supra*, 362 Md. at 305–06, 765 A.2d 97. *See also Gray v. State*, 368 Md. 529, 550, 796 A.2d 697 (2002) ("Article 22 of the Maryland Declaration of Rights has generally been recognized as being *in pari materia* with its federal counterparts"); *Lodowski, supra*, 307 Md. at 246–47, 513 A.2d 299 ("[T]he privilege against compelled self-incrimination in Article 22 . . . has long been recognized as being *in pari materia* with its federal counterpart.") (citation omitted).

 Upon a proper pretrial challenge, the State bears the burden of " 'showing affirmatively that [the defendant's] inculpatory statement was freely and voluntarily made. . . .' " *Winder, supra*, 362 Md. at 306, 765 A.2d 97 (citation omitted). In that context, "the State must establish the voluntariness of the statement by a preponderance of the evidence." *Id.* Ordinarily, voluntariness is determined based on a totality of the circumstances test:

In cases where we are called upon to determine whether a confession has been made voluntarily, we generally look at the totality of the circumstances affecting the interrogation and confession. We look to all of the elements of the interrogation to determine whether a suspect's confession was given to the police through the exercise of free will or was coerced through the use of improper means. On the non-exhaustive list of factors we consider are the length of the interrogation, the manner in which it was conducted, the number of police officers present throughout the interrogation, and the age, education and experience of the suspect. Maryland law requires that "no confession or other significantly incriminating remark allegedly made by an accused be used as evidence against him, unless it first be shown to

be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary."

*Id.* at 307, 765 A.2d 97 (internal citations omitted).

■ When a confession is "preceded or accompanied by threats or a promise of advantage," however, those factors are "transcendent and decisive," and the confession will be deemed involuntary "unless the State can establish that such threats or promises in no way induced [it]." *Williams v. State,* 375 Md. 404, 429, 825 A.2d 1078 (2003). *See also Knight, supra,* 381 Md. at 533, 850 A.2d 1179; *Hillard v. State, supra,* 286 Md. at 151–53, 406 A.2d 415. This two-pronged test, often called the *"Hillard* test," was explained by the Court of Appeals as follows in *Winder, supra:*

We will deem a confession to be involuntary, and therefore inadmissible, if 1) a police officer or an agent of the police force promises or implies to a suspect that he or she will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and 2) the suspect makes a confession in apparent reliance on the police officer's statement.

362 Md. at 309, 765 A.2d 97. *See also Taylor, supra,* 388 Md. at 401, 879 A.2d 1074.

■ The first prong of the *"Hillard* test" is objective. "We determine whether the police or a State agent made a threat, promise, or inducement." *Winder, supra,* 362 Md. at 311, 765 A.2d 97. "The suspect's subjective belief that he or she will be advantaged in some way by confessing is irrelevant. The [hearing court] instead determines whether the interrogating officers or an agent of the police made a threat, promise, or inducement." *Knight, supra,* 381 Md. at 534, 850 A.2d 1179.

■ "An improper promise or inducement occurs when 'an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration.'" *Id.* (quoting *Winder, supra,* 362 Md. at 308, 765 A.2d 97). "Courts abhor, or at

least find distasteful, promises of leniency or immunity made by state agents to defendants subject to the vulnerability of custodial interrogation." *Reynolds v. State*, 327 Md. 494, 505, 610 A.2d 782 (1992), *cert. denied*, 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993). "Those statements that have been held to be improper inducements have involved promises by the interrogating officers either to exercise their discretion or to convince the prosecutor [or other judicial official] to exercise discretion to provide some special advantage to the suspect." *Knight, supra*, 381 Md. at 536–37, 850 A.2d 1179 (holding in one of two consolidated cases that interrogating officer's statement to suspect that, "if down the line, after this case comes to an end, we'll see what the State's Attorney can do for you, with your case, with your charges," was "clearly a promise to exercise advocacy on [the suspect's] behalf to convince the prosecutor to exercise discretion in [his] favor[,]" and thus was improper).[14]

---

14. *See also Taylor, supra*, 388 Md. at 402–03, 879 A.2d 1074 (holding that interrogating detective's suggestion to the accused that he would make a recommendation to the commissioner about whether to set bail if the accused was cooperative in the upcoming interrogation "clearly constituted an improper inducement—an implication that, if he cooperated by giving a statement of his version of the event to [the detective], he would be given help with the commissioner"); *Winder, supra*, 362 Md. at 317–18, 765 A.2d 97 (interrogating officer's statement that he would try to give the suspect protection from angry friends of murder victim was an improper promise); *Johnson v. State*, 348 Md. 337, 347–48, 703 A.2d 1267 (1998) (interrogating officer's statement that if defendant confessed, he "might be able to receive some sort of 'medical treatment at [a hospital for the criminally insane]' instead of being 'locked up for the rest of [his] life'" was an improper promise); *Stokes v. State*, 289 Md. 155, 157–58, 423 A.2d 552 (1980) (statement by interrogating officer that he would not arrest the suspect's wife was an improper promise); *Hillard, supra*, 286 Md. at 153, 406 A.2d 415 (interrogating officer's statement, "[I]f you are telling me the truth ... I will go to bat for you" with the prosecutor by telling the prosecutor "that you have cooperated ..., you have told me the truth, and ... I believe you were not knowledgeable as far as the murder was concerned[,]" was an improper promise); *Streams v. State*, 238 Md. 278, 281, 208 A.2d 614 (1965) (statement by interrogating officer that "it would be better for [you] if [you] made a statement because if [you] did they would try to get [you] put on probation" was an improper promise).

 Mere exhortations to tell the truth and appeals to a suspect's inner conscience, in and of themselves, have been held not to be improper promises. *See Ball v. State*, 347 Md. 156, 172, 178, 699 A.2d 1170 (1997) (holding that detective's statement to murder suspect that it would be " 'much better if [he] told the story' " in his own words, by writing it out in the form of a letter of explanation to the victim's family, was not an implied promise to the suspect that he would be given help or some special consideration in exchange for making an inculpatory statement), *cert. denied*, 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998). Yet, "[a]n entreaty" by an interrogating officer to a suspect to " 'tell the truth' coupled with a promise that there would be benefits to the suspect . . . can render the statement involuntary." *Reynolds, supra*, 327 Md. at 507–08, 610 A.2d 782.

 "The second prong of the *Hillard* test triggers a causation analysis to determine whether there was a nexus between the promise or inducement and the accused's confession." *Winder, supra*, 362 Md. at 311, 765 A.2d 97; *see Knight, supra*, 381 Md. at 537–38, 850 A.2d 1179 (holding in the first of two consolidated cases that an interrogating officer's promise to exercise advocacy on the suspect's part with the prosecutor, although improper, did not induce the suspect's statement, which he made twice, both before and after the improper promise); *Johnson, supra*, 348 Md. at 350–52, 703 A.2d 1267 (holding that officer's improper promise to help defendant receive medical treatment instead of prison time did not induce confession).

Returning to the case at bar, Buck contends that Detective Piazza's "promise" that, if he came to the station house to discuss the Baroody murder, he would not be arrested that day (March 2) was an improper promise of a benefit that induced his confessions. We already have held that Buck's statements during his station house interview (and the ride to and from the station house) were made during custodial interrogation, without *Miranda* warnings, and therefore are not admissible into evidence. Because, unlike statements

made in violation of the rule in *Miranda,* an involuntary statement may not be used against a defendant for impeachment, as that use would violate his due process rights, *see Mincey v. Arizona,* 437 U.S. 385, 401–02, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), it may be that in further proceedings on remand, the State will attempt to impeach Buck with those statements. For that reason, we shall address his voluntariness argument as to all statements.

▬ The trial judge found that the words spoken by Detective Piazza to Buck, that he would not be arrested that day if he came to the station house to give a statement, were not a promise of special treatment or leniency, within the meaning of the *Hillard* holding. We agree. As Detective Piazza's uncontroverted testimony made clear, he was not offering a *quid pro quo*—that in exchange for speaking, Buck would not be arrested that day. Rather, he was explaining that Buck's coming to the station house to speak would not mean, necessarily, that he would be arrested that day. Indeed, the words were not treated by Detective Piazza or by Buck as a promise, as Buck in fact was arrested later that same day, without protest that he had been promised otherwise. The first prong of the *Hillard* test was not met. Moreover, the statements that Buck gave after he was arrested could not possibly have been made in response to this socalled promise, as he already had been arrested by the time he made them.

▬ Nor were Buck's statements to the police involuntary under the totality of the circumstances test described above. *See Winder, supra,* 362 Md. at 307, 765 A.2d 97. When deciding whether a confession has been made voluntarily, under that test, we look to all of the elements of the interrogation to determine whether a suspect's confession was given to the police through the exercise of free will or was coerced through the use of improper means. "The first step in determining whether a confession is voluntary under Maryland nonconstitutional law is to determine whether the defendant was mentally capable of making a confession." *Hoey,*

*supra,* 311 Md. at 481, 536 A.2d 622. "[A] defendant's mere mental deficiency is insufficient to automatically make his confession involuntary. Rather, a confession is only involuntary when the defendant, at the time of his confession, is so mentally impaired that he does not know or understand what he is saying." *Id.* at 482, 536 A.2d 622 (upholding trial court's determination, based on conflicting evidence as to mental capacity of schizophrenic defendant at time of defendant's confession, that defendant's confession was voluntary).

 Even when a suspect is experiencing mental impairment from drugs or alcohol, that "does not *per se* render [his] confession involuntary." *Hof v. State,* 337 Md. 581, 620, 655 A.2d 370 (1995). "[W]hether the defendant was under the influence of a drug at the time of giving the incriminating statement is a factor to be considered in determining the voluntariness of that statement." *Id.* (citing *Townsend v. Sain,* 372 U.S. 293, 307–08, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). "[A] court may admit a confession into evidence if it concludes that it was freely and voluntarily made despite the evidence of mental impairment." *Id.* at 620–21, 655 A.2d 370 (further citing *Dempsey v. State,* 277 Md. 134, 154, 355 A.2d 455 (1976) (holding that evidence of the defendant's drinking and intoxication was sufficient to raise a jury question as to the voluntariness of his confession); *Campbell v. State,* 240 Md. 59, 64, 212 A.2d 747 (1965) (holding that, while defendant probably was under the influence of narcotics at the time of his confession, that fact alone "d[id] not of itself make the confession not free and voluntary"); *Bryant v. State,* 229 Md. 531, 535, 185 A.2d 190 (1962) (same)).[15]

---

15. *See also Wiggins v. State,* 235 Md. 97, 101–02, 200 A.2d 683 (1964) (upholding trial court's determination that defendant's confession and statement were voluntary although made while defendant was suffering from alcohol withdrawal, and stating that "[t]he crucial question was not whether he was suffering from the effects of withdrawal from excessive alcoholic indulgences when he gave them, but whether his disclosures to the police were freely and voluntarily made at a time when he knew and understood what he was saying"), *cert. denied,* 379 U.S. 861, 85 S.Ct. 123, 13 L.Ed.2d 64 (1964); *McCray v. State,* 122 Md.App. 598, 616, 716 A.2d 302 (upholding trial court's determination

In this case, the evidence showed that the interrogating officers knew, from Buck's mother, that Buck had been diagnosed with depression, that he was taking several medications, and that he had been acting strangely and erratically. The evidence did not show, however, that Buck's mental state at the time of his interrogations was such that he did not know or understand what he was saying. Indeed, the evidence was to the contrary. Buck raised with Detective Minor, several hours into the interview at the station house, that the detective had told Detective Piazza on the telephone, the day before, that he (Buck) was the person they thought had committed the murder. He was able to precisely recount the events of the previous four days. He described in detail his motivations in taking the kitchen knife on his walk ("I was angry. I wasn't planning on killing anyone. I just thought if anyone came, I would stab him."), his reason for choosing Baroody ("easy target"), and his actions seeking to hide any evidence of the murder (cleaning the knife and washing the blood off his shoes). Buck was cognizant enough to engage in a detailed physical reenactment of the stabbing during a cigarette break, and to apologize for lying to Detective Piazza.

Similarly, in the subsequent post-*Miranda* interview with Detectives Elliott and Bean, while Buck had requested his medications and those medications were not immediately retrieved, there is no evidence that this lack of medication left Buck "so mentally impaired that he d[id] not know or understand what he [was saying]." *Hoey, supra,* 311 Md. at 482, 536 A.2d 622. When confronted with the physical evidence of his crime in addition to his previous statements to Detectives Piazza and Minor, Buck admitted that he had "told the truth" in his previous confession. He was able to recall that he had participated in a physical reenactment of the crime earlier in the day and affirmed that this physical reenactment was

---

that defendant's statement to law enforcement officer was voluntary, despite defendant's intoxication at the time, when evidence presented at the hearing was sufficient to allow the court to conclude that defendant "understood 'what was going on around her'" and "was mentally capable of understanding what she was saying").

accurate. He also acknowledged that he had lied previously to his parents about killing Baroody. There was no evidence adduced that Buck's actions during the post-*Miranda* interview were erratic or otherwise indicative of mental illness.

These circumstances showed that Buck was in command of his faculties and fully understood the import of his statements admitting guilt. The court did not err in holding that Buck's pre-*Miranda* and post-*Miranda* statements were voluntary. Thus, we reverse the suppression court's decision to admit Buck's pre-*Miranda* statements, but hold that the court did not err in admitting his post-*Miranda* statements.

## II.

### Evidentiary Sufficiency

Beyond the facts adduced at the suppression hearing, the only additional material fact elicited at trial regarding Buck's guilt was that the police seized a kitchen knife from Buck's house when they executed the search warrant and subsequent testing of the knife revealed the presence of DNA consistent with that of Baroody.

On November 30, 2006, ruling from the bench, the trial judge stated in pertinent part:

[Buck] is charged with first degree murder. And, the elements being [sic] that the conduct of [Buck] caused the death of the victim. I find the State proved that element beyond a reasonable doubt. The physical evidence, coupled with the autopsy report, proved that Mr. Baroody was murdered, and that his death was caused by a single stab wound to the back. The evidence proves, unequivocally, that [Buck] was the person who plunged the knife into Mr. Baroody, causing his death. Furthermore, there was no justification, excuse or mitigation.

The Court must find that the killing was willful, deliberate, and premeditated. Willful means that [Buck] actually intended to kill the victim. [Buck's] statements to the police were that he did not intend to kill anyone. However, an inference may be made that one intends the ordinary and

probable consequences of his behavior. Plunging a knife the size of the one used in this case into a vital area of the body indicates an intent to kill. Willful requires a specific purpose and design to kill. The action that was taken here establishes that.

Deliberate means that [Buck] was conscious of the intent to kill. His actions taken by removing the knife from his kitchen butcher block; sticking it in his pants; carrying it outside; walking in the neighborhood; coming up behind the victim; and plunging the knife into the victim's back and his later recounting the event in detail indicates he was aware of this intent to kill.

Premeditated. I find that [Buck] premeditated this event. He thought about killing. And, there was enough time before the killing, though it may only have been brief, for him to consider the decision whether or not to kill. And, there was plenty of time to weigh the reasons for and against the choice. Clearly this action by [Buck] was premeditated. He waited until his parents left the house to take a deadly weapon, a large butcher knife from the house and leave the house. He planned that if he encountered a person he would stab them. He had ample time to consider the decision whether or not to kill Mr. Baroody. After he encountered him [and] Mr. Baroody was marked or vulnerable, . . . he acted upon this impulse to kill.

On appeal, Buck contends the trial court erred in finding the evidence adduced sufficient to sustain a first-degree murder conviction. Specifically, he asserts there was insufficient evidence to support the court's finding that the killing was "willful": that is, there were no "surrounding circumstances in the present case from which there can be inferred a specific intent to kill." He argues that he told the police he did not intend to kill anyone and that he was mentally ill at the time of the homicide. These two factors, he argues, defeat any circumstantial evidence tending to show that he acted willfully.

The State counters that the evidence presented was sufficient to allow the trial court to find beyond a reasonable doubt

that Buck had formed the specific intent required for a conviction of first-degree murder.

In an action tried without a jury, the scope of our review is dictated by Rule 8–131(c): we "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *See State v. Raines,* 326 Md. 582, 589, 606 A.2d 265, *cert. denied,* 506 U.S. 945, 113 S.Ct. 390, 121 L.Ed.2d 299 (1992); *Choi v. State,* 134 Md.App. 311, 318–19, 759 A.2d 1156 (2000). In reviewing a challenge to the sufficiency of the evidence supporting a conviction, we " 'view[ ] the evidence, and all inferences fairly deducible from the evidence, in a light most favorable to the State.' " *Rivers v. State,* 393 Md. 569, 580, 903 A.2d 908 (2006) (quoting *Hackley v. State,* 389 Md. 387, 389, 885 A.2d 816 (2005)). Then, we determine whether " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Rivers, supra,* 393 Md. at 580, 903 A.2d 908 (quoting *State v. Smith,* 374 Md. 527, 533, 823 A.2d 664 (2003)).

A conviction for murder in the first degree requires a finding that the defendant's actions were "deliberate, premeditated, and willful." Md.Code (1957, 2002 Repl.Vol., 2007 Cum.Supp.) § 2–201(a) of the Criminal Law Article ("CL"). To find willfulness, there must be evidence adduced at trial "that the defendant actually intended to kill the victim." *Pinkney v. State,* 151 Md.App. 311, 331, 827 A.2d 124 (quoting Maryland Criminal Pattern Jury Instruction 4:17 (2001), *cert. denied,* 377 Md. 276, 833 A.2d 32 (2003)); *see also Willey v. State,* 328 Md. 126, 133, 613 A.2d 956 (1992). A defendant does not need to say that he intended to kill the victim in order for a rational trier of fact to conclude that the defendant acted willfully. *See Raines, supra,* 326 Md. at 591, 606 A.2d 265. Instead, because intent is a "subjective [concept] and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its exis-

tence." *Id.* (quoting *State v. Earp*, 319 Md. 156, 167, 571 A.2d 1227 (1990)).

In Maryland, it is well established that "under the proper circumstances an intent to kill may be inferred from the use of a deadly weapon directed at a vital part of the human body." *Smallwood v. State*, 343 Md. 97, 104, 680 A.2d 512 (1996) (quoting *Raines, supra*, 326 Md. at 591, 606 A.2d 265). *See e.g., Raines, supra*, 326 Md. at 591–92, 606 A.2d 265 (upholding intent to kill inference from evidence that the defendant, while driving, "fired a pistol into the driver's side window of a tractor trailer in an adjacent lane"); *Baker v. State*, 332 Md. 542, 569, 632 A.2d 783 (1993) (intent to kill properly inferred from evidence "that [the defendant] walked up to [the victim] in a mall parking lot, placed a handgun up against her head and then pulled the trigger"). This rule rests upon the more general legal maxim that "[i]t is permissible to infer that 'one intends the natural and probable consequences of his act.'" *Smallwood, supra*, 343 Md. at 105, 680 A.2d 512 (quoting *Ford v. State*, 330 Md. 682, 704, 625 A.2d 984 (1993)).

In the case at bar, regarding the willfulness of Buck's actions, the court found as follows:

> [Buck's] statements to the police were that he did not intend to kill anyone. However, an inference may be made that one intends the ordinary and probable consequences of his behavior. Plunging a knife the size of the one used in this case into a vital area of the body indicates an intent to kill. Willful requires a specific purpose and design to kill. The action that was taken here establishes that.

Buck offers no viable legal argument to support his assertion that no reasonable trier of fact could have inferred that he intended to kill Baroody under these circumstances. Contrary to Buck's assertion, the trial court did not *presume* from his actions that he intended to kill Baroody. *See Thornton v. State*, 397 Md. 704, 737–38, 919 A.2d 678 (2007) (error for trial court to presume an intent to kill from defendant's action of stabbing victim's leg with a knife). Rather, the trial

court drew the inference from Buck's deliberate plunging of a large knife into Baroody's back, that he intended to kill Baroody. This finding clearly was not clearly erroneous or legally incorrect.

## III.

### Trial Court's Finding that Buck was Criminally Responsible

As mentioned previously, Buck pleaded not criminally responsible for his conduct by reason of a mental defect or disorder ("NCR"). Buck's first witness on the issue of criminal responsibility was his father, John Buck. Mr. Buck recounted Buck's psychiatric history dating back to an adolescence in which he experienced hallucinations, social isolation, limited mental abilities, and multiple hospitalizations. During the hospitalizations, Buck was diagnosed with major depression. Mr. Buck produced numerous medical reports and documents to support his testimony, including at least one report showing that Buck has an IQ of 74.

Mr. Buck further stated that Buck's behavior in the period leading up to the Baroody homicide was strange and delusional. Yet, on cross-examination, Mr. Buck testified that, on the day of the homicide, Buck was not acting particularly strange. He ate dinner with the family that evening before the rest of the family members left at 7:00 p.m. for a sporting event. Immediately before the family left the house, Mr. Buck saw Buck lying on his bed, fully clothed. When Mr. Buck returned at 9:00 p.m., he again saw Buck lying on his bed, fully clothed.

Buck's second witness, Carol Kleinman, M.D., was called as an expert in forensic psychiatry, to testify about Buck's mental state. Dr. Kleinman reviewed Buck's medical history and interviewed him for about two hours on July 2, 2005. She concluded that Buck suffered from "schizoaffective disorder depressive type," "major depressive disorder," and borderline intellectual functioning. She opined that Buck was "unable to continue functioning" as a normal human being. He would

frequently "hear voices when no one is there ... or see visions ... [and] constantly feel that people are after [him]...."

Dr. Kleinman further opined that, notwithstanding that Buck appreciated the criminality of stabbing Baroody, he "lack[ed] substantial capacity to conform his conduct to the requirements of law." According to Dr. Kleinman, Buck suffered from "many different kinds of psychotic symptoms" over his extensive medical history that had caused him to "los[e] touch with reality." By the time of the murder, he was unable to control his behavior. She opined further that she did not believe that Buck was capable of "making up" these hallucinations and other schizophrenic symptoms due to his diminished mental capacity.

Angela Kim Lee, M.D., of Clifton T. Perkins Hospital, testified for the State as an expert in forensic psychiatry. Dr. Lee had reviewed Buck's medical history and conducted five interviews with him, lasting a total of approximately ten hours. She agreed with Dr. Kleinman that Buck was suffering from "schizoaffective disorder depressed type," but concluded that a "a diagnosis of borderline intellectual functioning could not be definitively made." She also opined that Buck exhibited a number of "antisocial traits," including repeated "fantasizing about harming other people and even killing other people." Buck had told Dr. Lee that he had put these thoughts into action at least twice before in assaulting other neighbors.

Dr. Lee testified that Buck had given her two different accounts of his mental status on the day he killed Baroody. In the first version, he said that "hallucinations of mushroom men [told] him to kill and to stab" Baroody. In the second version, however, Buck said he had experienced a chronic hallucination of someone screaming in his ear, but acknowledged that this was not a "command hallucination" in which he was being ordered to do some act. In recounting this second version of his mental status on the day of the murder, Buck told Dr. Lee that he had taken the kitchen knife with him in order to hurt someone because he was angry and frustrated that his life was not "going anywhere."

Dr. Lee concluded that Buck's second version of the events was the most likely to have occurred because

[Buck's] behavior [on the day of the murder] in my opinion was not disorganized. It was consistent with his original thoughts which began at least one or two weeks prior to the offense, again desire to harm someone related to a situation not psychotically related. He took steps to carry out that desire to harm someone by taking the knife; concealing his identity; by doing it at night after his parents left; and then his behavior afterwards.... And then when the police questioned him. Very strategic in my view, directed ... goal directed behavior, especially focused on trying to avoid responsibility for what he had done.

While Buck may have "decompensated" into more severe episodes of mental illness at times both before and after Baroody's killing, his account of his behavior on the day of the killing, as well as his post-homicide behavior, led Dr. Lee to conclude that, on the day of the murder, he "did not lack substantial capacity either to appreciate or conform his conduct to the requirements of the law."

To rebut Dr. Lee's testimony, Buck called Dr. Christopher Lange, also a psychiatrist. Dr. Lange had worked with Dr. Lee as an intern and had interviewed and evaluated Buck. Dr. Lange testified that Dr. Lee told him that Buck's case was "close" and so she was going to hold a "case conference" to present it to a group of forensic psychiatrists at the hospital. According to Dr. Lange, at the conference, half of the psychiatrists thought Buck was criminally responsible and half did not. Dr. Lange further testified that Dr. Lee closely questioned him about his finding that Buck did not suffer from a personality disorder and further "encourag[ed]" him to conclude that Buck was criminally responsible for the Baroody killing.

On cross-examination, Dr. Lange admitted that, in the end, he wrote a report opining that Buck indeed was criminally responsible for Baroody's killing. Although, at first, he doubted that Buck was "malingering" about the mushroom men

voices telling him to kill Baroody, he ultimately concluded that Buck had invented that story.

From the bench, the court made the following findings of fact and legal ruling:

There is no dispute that [Buck] suffers from a mental disorder . . . he needs care and treatment. He suffers from schizoaffective disorder. That this illness has severely affected his life. He is not able to take care of himself. He is not able to live independently. He has not been able to hold a job. . . .

However, the presence of a mental disorder does not, by itself, mean that a person lack[s] criminal responsibility. A person is not criminally responsible only if, as a result of the mental disorder, he lacks a substantial capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law.

In this case, [Buck] clearly understood and appreciated the criminality of his conduct. . . .

\* \* \* \*

To lack substantial capacity means to lack the power or ability to a material or substantial degree. In this case, the Court would have to find [that it] is more likely so than not that the mental disorder caused [Buck] to lack substantial capacity to be able to conform his conduct to the requirements of the law.

The court went on to recount the testimonies of Mr. Buck and Dr. Kleinman. The court took issue with Dr. Kleinman's opinion that Buck's mental disorder affected his ability to conform his conduct to the law, observing that Buck "was apparently rational enough to deny his involvement originally. He was rational enough to then change his story after the police say they had DNA evidence linking him to the crime." The court further observed, "There was nothing told to Dr. Kleinman by [Buck] that indicate[d] he was hallucinating at the time of the crime. Simply that his nerves hurt, whatever that means." Finally, the court noted that Dr. Kleinman had agreed, on cross-examination, that "anger, which [Buck] stated

was the reason he took the knife out that evening, was not a mental disorder and could be a motive for his actions. And, [Dr. Kleinman] stated, however, that his anger was a part of his illness."

After reviewing the testimonies of Drs. Lee and Lange, the court noted that, despite the "very negative relationship between the two doctors," "they do agree that [Buck] was malingering and that he was exaggerating or inventing the command hallucinations that he described." The court concluded that Buck "was criminally responsible at the time of this event."

Buck contends the trial court "erred in failing to find [that he] was not criminally responsible for his conduct." He urges this Court to reverse the trial court's NCR ruling as "against the weight of the evidence." Specifically, he maintains that the trial court erred by ignoring "the impact of Doctor Lange's testimony" showing that Dr. Lee had improperly tried to "dictate a result" without "objective evaluation" in his case.

The State responds that a determination as to criminal responsibility is "committed to the trier of fact" and the trial court's finding was not clearly erroneous.

As discussed in section II of this opinion, our review of the trial court's findings of fact is necessarily limited to whether such findings were "clearly erroneous." In conducting this review, we "give due regard to the trial court's opportunity to 'judge the credibility of the witnesses.'" *White v. Pines Comty. Improvement Ass'n*, 173 Md.App. 13, 36, 917 A.2d 1129 (2007) (quoting Rule 8–131(c)); *L.W. Wolfe Enters., Inc. v. Md. Nat'l Golf L.P.*, 165 Md.App. 339, 343, 885 A.2d 826 (2005), *cert. denied*, 391 Md. 579, 894 A.2d 546 (2006). We do not sit as a second trial court. *Pines Comty. Improvement Ass'n, supra*, 173 Md.App. at 36, 917 A.2d 1129.

Md.Code (2001, 2007 Cum.Supp.), section 3–109 of the Criminal Procedure Article, ("CP") provides in pertinent part:

(a) ... A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant,

because of a mental disorder or mental retardation, lacks substantial capacity to:

(1) appreciate the criminality of that conduct; or

(2) conform that conduct to the requirements of law.

The defendant bears the burden of proving, by a preponderance of the evidence, that he was not criminally responsible. *See* CP § 3–110(b) & (c); *Treece v. State*, 313 Md. 665, 684–85, 547 A.2d 1054 (1988) ("the burdens of pleading, producing evidence, and persuading the fact-finder that criminal punishment should not be imposed are all borne by the defendant"). The trial court is not concerned with the defendant's current mental state, because "the insanity defense only excuses the defendant who lacks the requisite cognitive or volitional capacities *at the time of the commission* or omission that allegedly violates the criminal law." *Robey v. State*, 54 Md.App. 60, 76, 456 A.2d 953, *cert. denied*, 296 Md. 224 (1983) (emphasis added).

In the case at bar, the trial court's thorough recitation of the evidence related to the issue of criminal responsibility demonstrates that the court considered all of that evidence and credited the testimony of Dr. Lee over that of Dr. Kleinman. The court acknowledged Dr. Kleinman's testimony regarding the general state of Buck's mental health and his mental capabilities, but then focused on Buck's mental state at the time of the homicide, as CP section 3–109 requires. As the court found that, on the day of the homicide Buck was not delusional; he had eaten dinner with his family immediately before the homicide; and he had the presence of mind to lie about his acts to the police and then to give the police a detailed description of his actions. The court credited the testimony of Dr. Lee that Buck was acting out of anger and not at the command of imaginary voices.

Further, contrary to Buck's current assertion, the court *did* take into account the testimony of Dr. Lange. The court noted in particular that, although Dr. Lange and Dr. Lee disagreed professionally on a number of issues surrounding Buck's diagnosis, both ultimately agreed that Buck had "mal-

ingered" about the supposed command hallucinations on the day of the murder, and that he was criminally responsible for his actions on that day. We have reviewed the entire record in this case and conclude that these findings were not clearly erroneous.[16]

**JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR CHARLES COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY CHARLES COUNTY.**

---

**16.** We do *not* affirm, however, the trial court's finding that Buck was criminally responsible. Because the admission of a confession is such an "integral part of the trial," on reversal of the suppression court's admission of a confession, the defendant is entitled to an entirely new trial so that the court may consider all of the remaining evidence "as a composite whole before making the ultimate determination of whether the accused is guilty or innocent." *Lodowski v. State*, 307 Md. 233, 257, 513 A.2d 299 (1986) (holding that, when the suppression hearing is inadequate, the defendant is entitled to a new trial and not merely a new suppression hearing) (quoting *Gill v. State*, 265 Md. 350, 357, 359, 289 A.2d 575 (1972)). Accordingly, if on remand the trier-of-fact finds that Buck did murder Baroody and Buck raises a "not criminally responsible" defense, it will be incumbent upon the trier-of-fact to make a new finding regarding Buck's criminal responsibility, without the benefit of his pre-*Miranda* statements—unless those statements are admitted in some other capacity not currently before this Court. *See Tu v. State*, 336 Md. 406, 420, 648 A.2d 993 (1994) ("[R]eversal for the erroneous denial of a motion to suppress does not, in and of itself, preclude any trial court reconsideration of the admissibility of the State's evidence that was the subject of the suppression motion, at least if the reconsideration presents a legal theory that was not ruled upon on the prior appeal. Further, facts that are relevant to applying that previously unadjudicated legal theory and that were not previously presented may be considered by the trial court, even if those facts were known to the State at the time of the original trial court ruling.").